## Case No. 12,258.

### The SALLY.

### [1 Gall. 401.] [1]

Circuit Court, D. Massachusetts.   May Term, 1813.

EMBARGO — TRADING WITH ENEMY — FURTHER PROOF—WHEN ALLOWED—FEES.

1. Trading with the enemy.  Case of violent suspicions.

See the great case of Griswold v. Waddington, 15 Johns. 57; Same Case on appeal, 16 Johns. 438.  See Scholefield v. Eichelberger, 7 Pet. [32 U. S.] 536; Story, Partn. § 240.

2. A claim in the prize court should always be by the owner, if within the jurisdiction.

[Cited in Re Stover, Case No. 13,507; Spear v. Place, 11 How. (52 U. S.) 527.]

3. Further proof is never allowed to a party, who is guilty of fraud, or of illegal conduct. It is granted only to honest ignorance or mistake.

[Cited in brief in The Revere, Case No. 11,716.   Cited in U. S. v. One Hundred Barrels of Cement, Id. 15,945; U. S. v. Seven Barrels of Distilled Oil, Id. 16,253.]

4. On further proof, the affidavits of the captors are admissible evidence without a release.

5. Where a claim is rejected, the claimant is liable to pay all expenses which have accrued in consequence of his claim; but not such as arise in the cause independently of it.

6. Of the clerk's fees, marshal's fees, and custody fees: what allowable, and when a charge on the property.

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty.

Mr. Savage, for captors.

Mr. Hubbard, for claimants.

STORY, Circuit Justice.  The schooner Sally and cargo were captured as prize by the privateer Dromo, Frederick Slocomb, commander, at Cape Split Harbor in the district of Maine, on the 28th of November, 1812, for an alleged trading with the enemy.  From the papers brought into the registry and the depositions in preparatory, it appears, that the schooner was licensed for the coasting trade, and was at Eastport in the fore part of November, 1812, and cleared out from that place for Boston, on the 16th of the same month, having on board, according to the manifest sworn to by the master before the collector, a cargo consisting of five hundred bushels of salt.  The only papers found on board were the enrolment and license for the coasting trade.  And although it appears from the examination of the master that he had a bill of lading on board, and also a letter of instructions from the shippers, neither of them were produced by him, and the instructions are yet withheld from the view of the court.  The real cargo on board is nearly three thousand bushels of salt.  The claim for the cargo is made by

[1] [Reported by John Gallison, Esq.]

Brigham and Bigelow, as agents for Messrs. Josiah Dana, Wheeler and Bartlett, of Eastport, the asserted owners, who are citizens of the United States. And the claim for the schooner is made by the master, in behalf of the asserted owners, Messrs. Thomas Waiscoat and Reuben Cousins, of Eden, in the district of Maine, who are also citizens of the United States. Reuben Cousins was the mate of the schooner during her voyage. And although he left her, for no assigned cause, after the capture, he has been admitted, through great indulgence, to give his deposition in preparatory. I cannot but notice, that the ship and cargo are both claimed by agents of the owners, although the owners are themselves citizens of, and resident within the state of Massachusetts. I cannot approve of this practice. In all cases where it is practicable, it is the duty of the owners to claim in person, or at least to annex their own affidavit to the special facts stated in support of the claim. There is great danger from a different course; it leads to the substitution of the oaths of mere uninformed agents, who can in general testify only to their belief, instead of the oaths of the parties, who are conversant with the facts, and have the most weighty responsibility attached to their conduct. There is yet less reason, in the case before the court, for the claim of that part of the schooner, which is owned by Reuben Cousins. He is on the spot, and ought to have made his own personal claim; and I am utterly at a loss to conjecture, upon fair grounds, why his interests should, in preference, have been entrusted to the common agency of the master.

Upon the hearing of the cause in the district court, the learned judge, on account of the extraordinary difference between the manifest and the real cargo on board, the nature of the voyage in the immediate vicinity of the British dominions, and other suspicious circumstances, directed further proof to be made, by plea and proof. This solemn mode of proceeding, so seldom resorted to, was of itself calculated to excite the utmost diligence of all the parties in interest. "Plea and proof," says Sir William Scott, in The Magnus, 1 C. Rob. Adm. 31, "is an awakening thing: it admonishes the parties of the difficulties of their situation, and calls for all the proof, that their case can supply." It was therefore to be expected, that the claimants would have given the most plenary and circumstantial account, by competent testimony, of the actual loading of the whole cargo at Eastport, and the most explicit denial of an intercourse with the British provinces. How far this most just expectation has been realized, I shall have occasion by and by to consider. Whether the present was a case, in which further proof ought to have been allowed, it does not become necessary now to decide, because no exception has been taken to the allowance; otherwise, perhaps, it might have admitted of great question, how far a party would be entitled to set up his own illegal conduct as a title to further proof. The rule adopted, and as I apprehend now firmly established, that no person shall be permitted, in the prize courts, to found a claim to property upon any act, which is illegal and reprobated by the law of the country, applies with stronger force to a case requiring further proof. Such an indulgence is allowed to honest mistake or negligence, but never to fraud or illegal conduct.

In the examinations in preparatory, the master has not given his testimony in a manner entitling him to extraordinary credit. He contents himself with general statements of facts, respecting which he must be presumed to have accurate knowledge. He says "he cannot recollect the day precisely, on which he sailed from Passamaquoddy, the last clearing port, but it was between the 16th and 28th of November." He cleared out, as his manifest shows, on the 16th of November, and he was captured, as he himself declares, on the 28th of November. Surely a man ordinarily intent upon declaring the exact truth could not have dealt in such vague and ambiguous terms respecting facts, of which a master of a vessel cannot be presumed ignorant. He states also, that the cargo "was all put on board betwixt the 14th and 16th of November," "that the whole of said lading was put on board at one port, at the time before stated," and "some of it was taken from the stores of the shippers, in Eastport, and the rest from a lighter or schooner sent by the shippers alongside the Sally." He admits that the cause of capture was the great difference between the cargo and the manifest. The mate is not more explicit, as to the time of the sailing on the voyage. He says that the schooner sailed from Eastport between the 15th and 26th of November: and as to the other facts, he concurs with the master. There are great difficulties in reconciling this testimony with the papers in the cause. If on the 16th of November the whole cargo of salt was on board, why was it not included in the manifest? It is impossible to contend, that the master did not know the difference between five hundred and three thousand bushels. He was bound to know the quantity on board; and he was guilty of the grossest departure from truth, if the whole cargo was then actually on board. He deliberately applied to the custom-house for a clearance, delivered a manifest of his cargo, and made oath to the verity thereof. What then is the court to believe? The solemn asseveration of the master, made at the time of his clearance, of facts then within his admitted knowledge, which he had then no inducement to conceal or deny, or his examinations taken when he has become materially interested to gloss over the transactions of his voyage and to give color to his former conduct? I confess that I am strongly inclined to lean in favor of the for-

mer. But it is sufficient if the master has so conducted himself, as to take away all reasonable credit from his assertions. He is so necessary a witness. that if he be completely discredited or brought into disrepute, a case must be very clear of all enemy contamination, not to be weighed down by his prevarications, especially when his counsel can support the innocence of his present statements, only by admitting his palpable contravention of the laws.

By the act for the regulation of the coasting trade (Act Feb. 18, 1793, c. 8, §§ 14, 18, [1 Stat. 309, 312]) the master of every vessel engaged in the coasting trade between ports of the same state, and having on board goods of foreign growth or manufacture exceeding $800 in value, is required to subscribe and deliver to the collector of the customs a duplicate manifest of his whole cargo, attested by his oath, under a penalty of $100. And if the value be less than $800, he is required to have on board a manifest of his cargo, under the penalty of $40, and the forfeiture of all foreign goods on board, which are not included in the manifest. I must take the value of the present cargo of salt to have exceeded $800; it was therefore necessary to have obtained a clearance from the custom-house: and this could only be done by delivering a duplicate manifest of the whole cargo, according to the act.

Upon the supposition of the whole cargo being laden at Eastport, it has been attempted to excuse the conduct of the master, by evidence tending to show, that it has been a common usage at that place, to obtain a clearance of foreign goods not liable to duties at the custom-house, under a manifest grossly varying from the real cargo. One witness states, that he has presented manifests of cargoes of salt, from five hundred to one thousand bushels, which have generally measured from four thousand to five thousand bushels. Another witness (and these two are the only witnesses to the point) states his belief, that it is the practice for vessels to clear out from Eastport with salt, without paying much regard to the exact quantity, frequently carrying a larger number of bushels than are cleared out, and that the collector is not, to his knowledge, scrupulous as to the exact quantity shipped.

It is hardly necessary to observe, that the attempt to establish a usage in contravention of law, must ever be a difficult, if not an impracticable task. Such a usage can never have a legal existence, and if it derive effect from the connivance or negligence of public officers, it deserves the most severe reprehension. If indeed the revenue officers of this district can be laid asleep, I trust and hope that the law has yet vigor enough to awaken them from their slumbers, and to dispel the dream of imagined security from the violators of its precepts. But there is not a shadow of evidence to establish any such usage. The practice of one or two persons, to falsify

their own solemn oaths by evasions of the laws, cannot be admitted to establish a general presumption, that all persons so conduct themselves. It might as well be contended that the existence of proofs of frequent smuggling established the position, that the whole mercantile community indulged in the odious practice. I hold myself bound to reject all presumptions in favor of the party, who claims protection from illicit conduct; and if a reasonable presumption arise, from other circumstances in the case, of a trade with the enemy, I shall feel little difficulty in applying it pro salute legis.

From the geographical situation of Eastport, we all know that it is within the immediate vicinity of the British provinces. It is scarcely removed more than two or three miles, and the dividing waters are common to both nations. It is asserted by the claimants, that salt at Eastport is not worth more than from twenty-three to twenty-five cents per bushel, and at Boston it is said to be worth fifty cents per bushel. The temptation, therefore, to illegal intercourse was great, and the opportunity every way favorable. If the whole cargo was taken on board at Eastport, what possible inducement could there have been to conceal the real quantity at the custom-house? None has been, and I presume no honest one could be suggested. That a part of the cargo, about five hundred bushels, was actually taken on board at that port, seems conceded on all sides; and if the intention were, under cover of this circumstance and the supposed irregularity of the custom-house, to complete the cargo by commerce with the enemy, the conduct of the master was precisely what it should have been. He was at liberty to make a truce with his conscience, and if detected, to shield himself without scruple under the protection of an infraction of the municipal regulations of his country.

Upon the original hearing, the case was so pregnant with difficulties and suspicions, that it called loudly for further proof of the most unquestionable and explicit nature. What has been produced? The mere loose, general and inaccurate affidavits of witnesses, who testify that salt was laden on board the schooner at Eastport, partly from a wharf, and partly from a schooner alongside of the Sally. This is not denied. It is remarkable that not one witness speaks of the quantity, and every word of the testimony is perfectly consistent with the supposition, that five hundred bushels only were laden there. There is obviously in the wording of the affidavits, an intention to avoid the statement of any precise quantity. This is not all. The claimants, who were upon the spot, have not given their own affidavits, as to the quantity. They have furnished no accounts of purchases, and no vouchers. From the circumstances relied on of the lading of a part of the cargo from a schooner, it is obvious that there must then have been a recent purchase

of that part of the cargo; yet no account of the quantity of the purchase is produced.

Further: Where was the Sally between the 16th and the 28th of November, the day on which she was captured? No account whatsoever is given of her; a perfect silence reigns over this part of the case; and yet, considering the place of capture, and the direct plea and allegation of a trade with the enemy, it was of the last importance to establish the whole course of her voyage. The master and the mate, notwithstanding their original examinations were taken within a month after the capture, say nothing precise on the subject; and no attempt has been made on the part of the claimants to escape from the obscurity or generality of their statements, by giving more exact information. The court have a right to expect the most accurate information from parties, having within our own jurisdiction the means in their own power, if they choose to use them, for clearing up every obscurity. They have not so done. What then must be the legal presumption? I think it must unavoidably be, that if the whole facts were truly disclosed, they would not avail in favor of the claimants. If we turn to the affidavits introduced by the captors, there can no reasonable doubt remain, as to an actual trading with the enemy. They state explicitly, that they saw the Sally and two other schooners lying in Clam Cove, in the province of New Brunswick, about the 20th of November, and a small black vessel delivering salt to one of them.

It has been argued, that these affidavits are not admissible, because the captors are not in any case competent witnesses. The objection, supposing it valid, certainly does not apply to the testimony of William Waller and Isaac Strout, for they did not belong to the crew; and taking their testimony together, it is certainly unfavorable to the claimants. The testimony also of William Gillpatrick, an officer of the Dromo, seems free from this objection; for he swears that he had disposed of all his interest in the prizes made during the cruise, and he may therefore be considered as standing in the situation of a witness under a release.[2] Now if he is fully credited, there is complete evidence of a trading with the enemy; and corroborated as he is by Waller, I think it difficult to resist the belief of his statements. But how stands the objection in point of law? If it is to prevail, it must be upon the footing of the prize law, and not of the common law; for the latter has, in general, no connexion with the course of prize proceedings. It is a general rule in the prize law of England, (from which ours may be considered to be derived,) that the evidence to acquit or condemn must, in the first instance, come from the ship's papers

and the preparatory examinations of the master and crew of the captured ship. By the French law, the depositions also of the captors are admissible; but in this stage of the inquiry, the law of England will not suffer them to be received (Coll. Marit. 76; Duke of Newcastle's Letter, Coll. Jurid.), and it is rarely permitted to the captors to produce any evidence, on account of its obvious tendency to derange the simplicity of prize proceedings, which the court is at all times solicitous to preserve. But in cases of pregnant suspicion, or to induce an order for further proof, extrinsic evidence on the part of the captors is sometimes admitted; and in exercising this authority, no exact rule can be laid down, and the court must be governed by a reasonable discretion under the particular circumstances of the case. After an order of plea and proof, the cause is always open for evidence to both parties; and in such cases, and also on an order for further proof, it is clear that the claimant's own affidavits and documentary evidence are admissible. Why not, on plea and proof, the affidavits of the captors, as to facts within their own knowledge? It is said that they have a direct interest in the event of the suit. This also is true as to the claimants; and upon principle I can perceive no ground to exclude the captors' affidavits, which would not also apply to the claimants.

No authority has been produced at the argument to show, that in cases, where the captors are admitted to give evidence on further proof, their affidavits are inadmissible. At first view the cases of The Drie Gebroeders, 5 C. Rob. Adm. 343, note a, and Amitie, 6 C. Rob. Adm. 269, note a, would seem to sustain the objection. The common law distinction, as to competency and credit, is there taken and admitted. The controversy was between persons claiming to share as joint captors, and the court rejected a witness who had been released, but still admitted that he thought himself entitled at law, and admitted a witness who was released, and yet declared, that though barred at law, he expected to share from the bounty of the master, if the claim succeeded. Neither of these were cases of further proof granted as an indulgence to claimants. In the case of The Haabet, 6 Rob. 54, the court, on the original hearing, refused to admit the affidavits of the captors for the purpose of working condemnation, or at least to save the captors from expenses, upon the ground that there was an utter defect of all circumstances of suspicion in the original evidence. Sir W. Scott said: "If I should accede to this demand, the consequence would be, that I must do it upon a uniform principle of admitting affidavits universally and in all cases, though there should be nothing to excite suspicion in the original evidence, and though the language of all the witnesses is as precise as possible. I can come to no such conclusion." "Looking to the depositions (of the

---

[2] An assignment of prize property is good at common law; and after condemnation the title becomes by a retro-active operation perfect in the assignee. Morrough v. Comyns, 1 Wils. 211.

captured) I am obliged to hold, that the affidavits of the captors are inadmissible." In the Glierktigheit, Id. 58, note a, when, on the original hearing, affidavits of the captors were offered to prove the destination of the ship, Sir W. Scott said: "Certainly if the captors' evidence could alone be taken, it would be sufficient to substantiate this averment, but the court is under the necessity of not taking their representation alone, and if that is positively contradicted, the court finds itself under a dilemma, to which it must always expect to be reduced by admitting such affidavits. When the facts are positively denied, and that denial cannot be invalidated by any adequate means of estimating the credit of the witnesses, there is no other way of proceeding, but by laying out of the case all this extrinsic matter, and by recurring to the original evidence." The ground then, on which these determinations rest, is, that if the testimony of the captured is positive and direct, and no circumstances of suspicion intervene, the court, on the original hearing, will adhere to the original evidence, in preference to extrinsic evidence offered by the captors. But it is not intimated in either case, that the affidavits of the captors are inadmissible, on the general ground of the incompetency of the witnesses; and there is no suggestion of a release.

On the whole, I cannot find any sufficient authority, which precludes the court from receiving the affidavits of the captors, in cases of further proof, where any evidence on their part is admissible; and of facts, which are within their special knowledge if suspicion attaches to the original transaction, I see no reason to preclude them from giving testimony, at least for the purpose of requiring the most explicit disavowal on the part of the claimants. Where further proof is required, the captors are not more interested than the claimants. There is a foundation laid, at least, in the original defects of evidence, to call the vigilant attention of the court; and though, if the testimony were balanced, the court ought to incline to the side of the claimants, I can easily conceive of cases, where at least equal credit would belong to the captors. I admitted therefore the affidavits of the captors to be read at the hearing; and I am not yet satisfied that that proceeding impugned any known rule of the prize court. The Maria, 1 C. Rob. Adm. 340, 349, note a. But I am free to acknowledge, that my present judgment is not founded on the affidavits, to which the exception would legally apply. Independent of these, there were such vehement suspicions and mala fides attached to the transactions, that if they were not removed by the further proof of the claimants, a condemnation seemed inevitable. That further proof has been made, and I have no hesitation in pronouncing, that it is wholly unsatisfactory to prove the innocence of the claimants. By the general rule of the prize court, the onus probandi lies on the claim-

ants, and if it were otherwise in this particular case, the order for further proof would impose on them the same responsibility. I feel a thorough conviction, that I am doing no injustice to the claimants by declaring the schooner and her cargo good and lawful prize to the captors, on account of illegal traffic with the enemy. Decree reversed.

### (Second Hearing.)

STORY, Circuit Justice. The principal questions on the merits having been now disposed of, an application has been made to the court respecting the taxation of the costs and expenses against the claimants. The bill presented to the court is as follows, viz.:

| | | |
|---|---|---|
| Attorney's fee | | $ 25 00 |
| **Depositions.** | | |
| F. Slocomb | $ 6 00 | |
| S. Lee | 6 00 | |
| W. Gillpatrick | 3 00 | |
| W. Walter | 2 00 | |
| J. Strout | 2 00 | |
| | | 19 00 |
| **Survey and Appraisement.** | | |
| Surveyor's fees | $24 00 | |
| Marshal's do | 9 50 | |
| Clerk's do | 4 00 | |
| | | 37 50 |
| Marshal's fees and charges | | 75 94 |
| Clerk's fees, entry, filing, recording, &c. | | 25 00 |
| | | $182 44 |
| **Circuit Court, May, 1813.** | | |
| Copies | | $ 35 00 |
| Attorney's fee | | 25 00 |
| Filing, recording, &c. | | 25 00 |
| John Rice's bill | | 82 67 |
| | | $350 11 |

The items objected to by the claimants are, 1. The clerk's fees for recording the proceedings, and for the copy thereof transmitted to this court. 2. The marshal and clerk's fees on the sale under a perishable monition. And 3. Mr. Rice's bill for dockage and custody.

It is the unquestionable rule of the court, that the claimants shall not be liable for expenses, which would have been incurred independently of the interposition of their claim; but for all charges and expenses, which grow out of their claim, they must be held responsible. On this ground, the commissioners' fees for the depositions taken under the standing interrogatories, though not objected to, must be deducted; but the expenses of the depositions of Slocomb and others, which were admissible on the order for further proof, are properly chargeable. The survey and appraisement, having been made at the instance of the claimants, fall under the same consideration.

The objection to the clerk's fees for recording, &c. rests upon the ground, that he is not obliged to record all the proceedings in the circuit court; and, at all events, is not obliged to record the evidence. But however true the latter position may be under our practice, as to causes on the instance side of the admiralty, (on which I give no opinion), I am well satisfied, that the clerk is bound to

record the whole proceedings in this court in prize causes, as the evidence is always in writing, and inseparable from the allegations of the parties.

The ship's papers and preparatory examinations constitute the essential and indispensable proofs of a right to acquittal or condemnation; and foreign nations, as well as our own citizens, are interested in the preservation of a perfect record of all the evidence submitted to prize tribunals; and I take upon me to say, that such is the general practice in the admiralty courts of other countries. It is not contended, that the sum charged by the clerk is more than a reasonable compensation for the labor of recording the proceedings, and it must therefore be allowed, unless it exceed the sum allowable by law.

As to the fees for the copy of the proceedings, it is a mere question of fact, whether the sum claimed by the clerk is to be allowed or not. The statute of 1st of March, 1793, c. 20 [1 Stat. 332], has prescribed the fees of the clerk for services of this nature, and the court is bound to apply the regulations. It will be easy for the counsel to ascertain the amount which will become thus due to the clerk, and that sum and no more can be allowed.

As to the marshal's and clerk's commissions on the sales of the cargo by order of court, I think that, in general, it must be considered a charge on the property itself. It is a proceeding adopted for the benefit of all parties, and unless in very special cases, should be paid by the party, to whom the property is ultimately awarded. Nothing has been presented to the court, to distinguish the present case from the general rule.

As to the dockage of the schooner, I think it must be allowed against the claimants, from the time of the interposition of their claim to the time of the delivery on bail. This expense was necessarily incurred for the preservation of the vessel, during the litigation of their claim; and they have not, in my judgment, entitled themselves to be relieved from the burthen. Cases may occur, in which it would be highly proper to make this a charge on the property.

With respect to the charge of Mr. Rice for custody, the allowance of it depends altogether upon the facts. If a person was actually employed to take care of the schooner during the whole time, a proper compensation for his services ought to be allowed. If no person was employed, I should not, as at present advised, incline to grant a compensation for ideal custody. There should be an actual superintendence over the property, to entitle the party to a beneficial recompense. And even in cases of actual custody, if there be gross negligence or fraud, I should have no difficulty in refusing the party any compensation. Let the captors show, by affidavit, whether there has been any actual custody, and what would be a reasonable compensation. If actual custody,

with competent diligence, be shown, I shall allow the item against the claimants, as this is not a case entitling them to a very favorable consideration in this court.